Good morning, Your Honor. David Slotnick for Plaintiffs and Appellants on the House Syndication and Carey Brothers. Given the fact that we are dealing with a cross-appeal, I would like to reserve five minutes for my rebuttal. When my clients, the Carey Brothers, and I get together, we too often wind up talking about food. And when Morris Carey came to me with this case, he said, Isn't it really like if Jim and I went to dinner, he ordered steak, we both ordered steak, excuse me, and they delivered him a steak but gave me a hamburger, and then later charged us both for steaks? How could they do that? And then I asked the, Morris continues, I asked the waiter, well, you know, I understand you're out of steaks. You gave my brother the last steak you had, but how can you charge me for a steak when you've given me a hamburger? That analogy, we believe, is precisely what FedEx did here. On August 4, 1997, On the House sent a package via FedEx Priority Mail, which means delivery was required by 10.30 a.m. the following day. The package wasn't delivered until 3.11 p.m., over four and a half hours past the contractual delivery commitment. But they told you they couldn't guarantee that anymore before you shipped it? They told us that, but they didn't revise, number one, they didn't revise the contract until August 8, Your Honor, to suspend the money-back guarantee. But even... Why didn't the press release a modification of the service agreement? I don't understand why. Your Honor, I'm happy to answer that question, but it really does go more to the appellee's appeal. The press release is a press release. It's no more, it's no less. If one looks at the document, it was not intended to suspend the money-back guarantee. It was not intended to... It wasn't? Absolutely not, Your Honor.  It says, as provided in the service guide, it did not change the contract one iota. It was not intended to. Mr. Glenn's deposition testimony, which is in the record, makes clear that he did not, and he was the person who had sole authority to amend this contract. He was the person who testified that he did not regard that press release, or his approval of that press release, as an amendment of the contract. But more fundamentally, Your Honor, we're dealing here with a press release. If press releases can modify integrated contracts, the whole world of commerce is turned upside down. We have a 120-page formal contract here. Well, but it's not a contract in the sense of signed by two parties. In part of the service guide, that tells you in more detail how this thing works. Well, maybe this is an amendment to the service guide. I've got a related question that ties, I think, directly to Judge Silverman's question, and that is, on August 8th, we have a signed statement by T. Michael Glenn, Senior Vice President, which purports to be an amendment of the service guide. And it says, in precisely the same words as the press release said, as provided in our service guide and until further notice, we will not offer money-back guarantees. Now, is that an amendment to the service guide? That is an amendment to the service guide, Your Honor. Now, whether it- Okay. That's the answer I thought you were going to give me. But it doesn't say anything other than that which was said before. Whether- You relied previously on the language that said, as provided in our service guide. This says, as provided in our service guide. Why isn't it either- This is a double-edged sword. I understand, Your Honor. Why wasn't it an amendment back on July 31? Or, to the other side, well, if it wasn't an amendment on July 31, why all of a sudden is it an amendment? It says, as provided in the service guide. Your Honor, I think there are two issues here. One is, does this language operate to amend or to suspend the money-back guarantee? That's one question. But another question, before we get to that, and I will address that question, is can you amend a contract, even, again, a one-sided contract that parties don't sign off on, the other parties, by just issuing a press release when the contract specifically prohibits it? What exactly is wrong with the fact that it says press release on top? I mean, is it on the wrong color paper, or does it have to be on a certain size sheet of paper, or what? No, Your Honor, but to revise the contract, as the Second Circuit held in the Boughton case, that the district court was a signed contract between two parties, and there was this mail-gram thing that seems to me to be completely inapposite. But I don't understand why, if it happens to say press release on top, it contains all the other necessary language that is insufficient. Your Honor, if there is, admittedly, in this context, the plaintiffs aren't relying on the existence of a document titled Amendment to Contract. Nonetheless, to properly revise a contract of this nature under the Wallin's opinion, under the Airline Deregulation Act, which allows FedEx considerable latitude, they have to follow the appropriate procedures required to revise a contract. I'd like to return, if I may, to Judge Fletcher's question about the language. And I agree that the language in either instance really does not suspend the money-back guarantee. It merely says, as provided in the service guide, we will not honor that guarantee. We don't believe that language was operative to suspend the guarantee in the first instance or in the second instance. But I gather, just to make it clear, you're not arguing that after August 8th, after the purported amendment, that you have any damages coming to you? That's not a question in front of us today. We did not argue that, Your Honor. Well, we are arguing that there are damages under the excess charges claim, but not under the money-back guarantee claim. Under the guarantee, there is no issue post-August 8th, Your Honor? No issue. The district court ruled that this was not, the press release was not an effective amendment to the contract. And that's, we're accepting that ruling. And that's the argument that we're making. So we are not seeking damages under the guarantee post-August 8th. But we are seeking damages post-August 8th under the excess charges claim. And this is a separate claim. This is simply a claim. But if you're seeking damages after August 8th for the excess charges claim, I've got two problems with your argument. Number one, you never made a claim under excess charges. And the longest you had to make a claim was a year. It's very clearly set out in the service guide. Second, I don't think this comes within the meaning of excess charges. At least as I understand the service guide, what excess charges refers to is you tick off these various boxes. One of them says overnight. The other one says super deluxe overnight. The other one says every two days when we feel like it. If they check the two-day service and they charge you for overnight, that's an overcharge. If, on the other hand, they charge you for overnight and they fail, that comes under the guarantee. That's a service failure as FedEx terms it. And you're trying to shove service failures into the overcharge proposition. Your Honor, we are not relying on the overcharge proposition in the contract. We believe that there is where there is a specific contractual provision, as here, for a specific rate on a time-specific basis, that we have the right to enforce that contractual provision. Regardless of whether there's a specific statement in the contract that gives us an express right to damages, we have the right under the federal common law to seek damages for that clear violation of the contract, of charging us for a delivery, a priority overnight delivery, when they gave us a lesser service, with a lesser service that has a specifically defined contractual rate. I would like to go back to the point about the claim. And I think that there are really three points to be made in that regard. One is that we believe, Your Honor, it's absolutely correct that the overcharge provision is not the governing provision, that there really, to the extent there is a provision, it was the money-back guarantee which was suspended. And we concede that. So you're relying for your post-August 8th theory of recovery on no provision at all in the service guide, but just general background contract law under the common law? No meaningful provision for any specific remedy that's available under the service guide. You can always sue for damages as the default remedy when there's a violation of a contract. And there's no prohibition from the service guide on that remedy, which the federal law has consistently recognized. Your Honor, with regard to the claim issue, because I think that is an important issue, I think the Court addressed a similar issue in the Ingram case, where it held, we think it appropriate to insist, as we did in Kearney, that the text of a plan be unambiguous. If an insurance company seeking to sell and administer an ERISA plan wants to have discretion in making claims decisions, it should say so. It is not difficult to write, the plan administrator has discretionary authority to grant or deny benefits under this plan. It would not have been difficult for FedEx to state in one sentence, you must file a claim with FedEx prior to bringing any action in court. What does the relevant contractual language say? One sentence. The right to damages against us under any cause of action arising from the transportation of packages pursuant to this guide shall be extinguished unless an action was brought within two years from the date of delivery of the shipment or from the date on which the shipment should have been delivered. Nothing in this contract states that plaintiffs need to pursue an internal claim prior to bringing a suit for damages. What does it say about making a claim on the money-back guarantee? Your Honor, under the money-back guarantee, plaintiffs were required to make a claim, but there's no difference there, either in writing or telephonically, and that's an important point that I'd like to get to, because that relates to the district court's findings of futility. And those findings, that a claim by plaintiffs here would have been futile, are overwhelmingly supported by the record, and FedEx does not really attack that. Not only did FedEx issue the press release, not only did it put the information on its computer website, on the 800 numbers that customers call or try to call to register complaints, there was a recording telling people that the money-back guarantee had been suspended. Do you have to show, I'll call it reliance, it's a slightly more complicated concept than I can do in a single word, do you have to show that you would, in fact, have made a complaint or filed for your money-back guarantee? We know that, in fact, most people don't. No, Your Honor. Why don't you have to show that? Your Honor, we think the principle is really akin to the principle of the affiliated youth decision, that you can't force a party to show this kind of negative. When people were told... But what I'm asking is, well, maybe the client didn't know that he was told. I mean, do we have anything on the record that shows your client or unnamed members of the class called up, got that? I mean, what did they know? What did they rely on? Your Honor, I... How did they know it was futile? Your Honor, there were one... It was futile, and they just didn't do it anyway. I mean, why should we say that we'll treat them as if they had not? Your Honor, there were... The record does show at pages 1004 and 1007 of the ER that there were more than 1.9 million customer callers during the four-day period from August 4th to August 7th to the FedEx 800 number that deals with the claims. There were substantial claims or attempts to make claims. Wait a minute. Hundreds... I'm sorry. You're, I think, confusing telephone calls with claims. Well, Your Honor, the money-back guarantee specifically allows a telephonic claim. And were these telephone calls telephonic claims, or were they just telephone calls? Well, we have no way of knowing. Of course. We have no way. In fact, the 1.9 million were not necessarily claims. Not necessarily all claims. Presumably some were claims and some weren't. Well, there might have been claims, but apparently they weren't accepting claims. Well, exactly. They weren't. People got a recording. But we don't know how many of those were inquiring, how many of those were wrong numbers, how many of those were saying, take my package, please. That's correct, Your Honor. We don't know that. What we do know is that there were millions of calls that numerous calls were just dropped. I mean, FedEx could not even handle them, and that's in the record, that the calls were abandoned. Our position is that the futility exception, to the extent there is a claims requirement, does not have a reliance type of element. There are so many issues here, and we're pressed for time, and I apologize for moving you on to a different issue. Assuming for the moment that the money-back guarantee claim is still valid prior to August 8th, assuming that we can get past the failure actually to make the claim on futility or on some other grounds, nonetheless, as we look at the actual money-back guarantee provision, it says we won't give you the money back unless we have, unless our negligence is solely responsible for the delay. How do you deal with that? Your Honor, we think there's... Solely responsible, not partially, but solely. We think there are three legitimate responses to that. Number one, that that sole negligence clause really is inconsistent with the concept of the guarantee and needs to be construed against FedEx. Well, wait a minute. When you say inconsistent with the concept of the guarantee, it's written right in there. I'm reading money-back guarantee policy. A service, and this is A, 4, and then B, a service failure will not be deemed to have occurred if within 30 calendar days after you notify, we provide you with service exception information reflecting that the failure to timely deliver resulted from circumstances described under liabilities not assumed. Liabilities not assumed talks about solely due to the negligence. I mean, how can that be inconsistent with the money-back guarantee? It's right there. Your Honor, the guarantee provisions that appear, the concept of the guarantee, when FedEx fails to meet its commitment to deliver by a certain time, we believe is inconsistent with limiting their liability to something that's less than negligence, than common law negligence. Beyond that... But you have to go outside the explicit money-back guarantee to say that. The prior references in the contract to the guarantee and to the delivery commitments are what we rely on in that regard, Your Honor. Not the full text of the money-back guarantee. We think that the contract read as a whole is inconsistent in that regard. More importantly, each of the force majeure provisions puts the burden on FedEx, under the law, to show a causal link between... And I purposely pulled this out because I think it's more difficult for you. This is not the force majeure provision. Well, it is not the force majeure provision per se, but it also, we believe, has a causation requirement that FedEx, which is in sole possession of the relevant information, FedEx takes the package and has sole possession of it until it makes delivery. It is the only... Plaintiffs have no idea what happens to that package in the interim. Only FedEx can account for the delay. And therefore, under the law and under the cases that impose this burden under the force majeure provisions, the same rationale applies here because only FedEx can account for what happened to the package and it must have the burden of showing. Mr. Zlotnick, you said you wanted to reserve some time. You have about two minutes. Thank you, Your Honor. I'd like to reserve. Thank you. Good morning. Good morning, Judge Holdman. I'm Walter Dellinger. I appear for FedEx. It might be useful if I began just briefly describing what kind of shipments were encompassed within this case. Let's take a standard example, hypothetical, but squarely within this class. You have a shipper who's got a very important package that he wants to send from Pasadena to North Carolina. He needs it there in the morning. Knows that 185,000 UPS workers are on strike, 12 million packages flooding the system. He chooses second highest priority that FedEx offers, which is the first overnight delivery. Pays for it. Knows that the money back guarantee is not being offered at this time, but wants his package given expedited treatment. For all that appears in this record, it got the same expedited treatment that the packages always do. That is, from the time it was coded when it was picked up through midnight transfer in Memphis, through placement in the recipient's town delivery truck in a special place for the priority shipments, it got expedited careful treatment throughout. Because of that, it arrives early in the morning. But because of the strike and the flooding, it gets there at 8.30. This is an 8 a.m. guarantee delivered. The recipient, when she comes to her office at 9 a.m., finds the package on her desk. She tells the shipper the package was here, it's been here for 30 minutes. The invoice says it arrived 30 minutes after 8, but the shipper files no claim, seeks no refund, makes no call, and why would he? That is an example, and yet nearly two years later, a lawsuit is filed in the name of this shipper and 400,000 other shippers, generally very sophisticated commercial shippers, who suffered no injury, sought no refund, filed no claims, had no loss. This is barred by three separate wholly independent and dispositive provisions. The first, as Judge Fletcher was noting, is the provision that you have to file a claim with FedEx within 30 days as a prerequisite to having the money-back guarantee. The second is the force majeure clauses, which we believe fully applicable here. And the third is, of course, that on the first day of the strike, July 31st, FedEx publicly announced on all the wire services, on the business wires, we are not offering the money-back guarantee. Counsel, did you consider that to be an amendment to the service guide at that point? Judge Wallinson, we did not consider it necessarily to be an amendment of the service guide because, in our view, the service guide, by virtue of the force majeure provisions, had automatically suspended the money-back guarantee. But if we were wrong about that, then we do consider it to be, and it did have the effect of amending the service guide. If that sounds to you like we're having our cake and eat it too, it is that the force majeure provisions say that delays, we're not liable for delays caused by circumstances beyond our control, those that are not caused by sole negligence, those that are caused by strikes. Nonetheless, to the world, on July 31st, the air bill clearly says on the back, then in 97 and now, by giving us your package to deliver, you agreed to the terms. So what FedEx says is we're not offering the money-back guarantee. They did it as long as we're on that point. It was authorized by the relevant official. Every aspect, it may be helpful if I just briefly. Would that help you, Mr. Glenn? Yes, Mr. Glenn, T. Michael Glenn. As you noted, it says quite clearly, as provided in the service guide, we will not offer money-back guarantees until further notice. Under the service guide, FedEx has the right by authorizing the senior vice president to modify in writing the features of the service guide because it is, and do it without notice, but FedEx did decide to announce it to the world, and they did it in the way that one would do that, by releasing it to the press. There's no doubt that it. Counsel, isn't there a little inconsistency, though, to say as provided in our service guide, we will not offer money-back guarantees if the service guide does, in fact, have a money-back guarantee provision? The service guide, the air bill says that the service guide controls. The service guide itself says that the money-back guarantee is available upon request and under conditions, and it expressly says in the service guide itself that it is subject to revision. This is a provision of the service guide, and the money-back guarantee expressly references this provision, so that I understand your question. Part of our problem is that we have not just belt and suspenders, but belt and suspenders and bungee cord. The clear weight of this enormous infusion of packages triggered the force majeure clauses, but we also announced on July 31st that we had done it, and the central requirement is that it be authorized by the relevant senior official, and Mr. Glenn, in his deposition, the excerpts of record at 1086, says, let me state for the record the fourth or fifth time I am 100 percent sure I approve this press release as written prior to its issuance. I want to make sure I'm understanding the argument you're making here with respect to what's put up here. You're quoting from the service guide that said FedEx reserves the right, and by Senior Vice President Mark, being unilaterally to amend, and clearly Mr. Glenn is that person. The press release on the 31st of July says, as provided in our service guide, Are you saying that the phrase, as provided in our service guide, refers to the right to amend, which you quoted directly above, or are you saying that, as provided in our service guide, that refers to force majeure? That's not clear, Judge Fletcher, and I wouldn't assert that it clearly means the first, because what I think is the effective amendment is that the service guide says that the money back guarantee is available on certain conditions and upon request, and this says we will not offer the money back guarantee. I think that is clear enough. Let's try to understand what it means, as provided in our service guide. That is to say, that's a qualifier. It doesn't say we will not offer money back guarantees. It says, as provided in our service guide, we will not offer money back guarantees. That is to say, is that merely a reference to the force majeure clause, which Mr. Glenn seems to say in his deposition at 1080 and you quoted in your brief, or is it, as provided in our service guide, we hereby amend, and you know what? No money back guarantees. Just don't pay any attention to that clause. Judge Fletcher, it's an interesting question. I think the answer could not be clearer that the money back guarantee was not being offered. That is, it was not saying... Well, again, what does as provided in our service guide mean? We are not offering money back guarantees, provided force majeure is triggered? Well, the service guide offers two possibilities for that. That is, with no action on the part of FedEx, the service guide automatically suspends when you have a force beyond our control that causes the delays. And it allows us to modify it, so that I think that there has been no suggestion by... No, it's clearly a modification. I think it was so clear that... In other words, you are relying on the top of the board, which says Federal FedEx reserves the right to modify. That's what as provided in our service guide means. That is certainly a correct reading. But that's exactly the opposite of what Mr. Glenn said in his deposition. Our position is that the money back guarantee was not in effect because of the force majeure. But we also publicly stated that we're not offering the money back guarantee. And I can tell you that no one has suggested in this litigation to this point that the statement, we will not offer money back guarantees until further notice, was in any way qualified. Or that anybody of the 400,000 shippers or the plaintiffs at any point ever thought that means that the money back guarantee is not being offered if but only if you, the customer, somehow agree with or disagree with FedEx's interpretation of the force majeure. I mean, it's a complicated thought. But everybody understood we're not offering the money back guarantee. The telephone line says we're not offering the money back guarantee. Everybody understood. I mean, a lot of everybody's out there. Well, there's no one who has been called to our attention that does not understand that. But the counseling issue in this case is whether or not the press release served to amend the service guide. And at ER 1081, I thought Mr. Glenn testified that there was no intent to change a policy. That is correct, Judge Rawlinson. And that is because Mr. Glenn believed, as I believe today and as our position, that the provisions of the service guide, the three force majeure provisions, had clearly suspended the money back guarantees because the delays were being caused by the strike. And therefore, there was no need to. But if there's any doubt about that, we publicly announced to the world that we're not offering it. Now, let me, because it seems to me that one thing that is most clear about the money back guarantee is that it is a creature of contract. It is in addition to the remedies normally offered, which are actual damage or actual delay. And it clearly says that in order to qualify for a refund, we must receive your notification within 30 calendar days. The plaintiffs concede that there was no notification within 30 calendar days. And therefore, they don't qualify for a refund. A confusion in this case is whether this is subject to some kind of futility response as if it were an exhaustion of remedies requirements. This is a substantive part of what you must do in order to qualify for a refund. And that has been made absolutely clear in this circuit in 1985 in Taisho Marine versus the Vessel Gladiolus, where the court upheld the application of a requirement of a timely written notice. What you have to do, you don't have to exhaust the administrative claims process. You have to give notice to FedEx within 30 days of a service failure. And here's what this court said about a similar provision. A requirement in a bill of lading that claims for loss or damage be made in writing within a specified period of time after delivery of the property is intended to facilitate the carrier's investigation of the occurrence to enable the carrier to protect its interest. And the court says the form is less important than its adequacy in appraising the carrier of the basis for that claim and the fact that reimbursement will be sought. So that this is a provision for the benefit of the carrier, and a district court in the Williams versus FedEx case in this circuit has applied that precisely in the context of this contract. The key words of this case is a little different where you have a wholesale acknowledgement that you're not going to honor that part of the service guide. Wouldn't you say that that's a little different than a contract where there has been has not been that circumstance? No, Your Honor, and the cases make clear that the requirement to put us on notice applies anyway. We had no ability to find out or investigate anything about the causes of the delays. If there are any cases that would be an exception, because we got no notice that claims were being filed, and therefore we were clearly harmed by this. What they're doing in this case is not just asking the court to transform the contract, but to transform the industry. The key words in one sense here are upon request. Neither FedEx or any of the other major carriers has ever offered a contract which would automatically refund or credit delivery charges whenever the record showed that the delivery was 60 seconds or more late. Counsel, if you're not honoring the money back guarantee, if you've already said that that's not in effect, then how do you rely upon the provisions of that if it's not in effect anymore? Because the bet did not terminate the entire contract, and both the Case Show and the Norton Spiel case expressly preclude the existence of a futility exception in any event under Federal common law. Here's what all of FedEx's competitors have to say in the Cargo Airline Association brief. They're just two sentences that go right to the heart of it. Carriers have designed their prices, services, and money back guarantees based on the knowledge that refunds will be paid in only a small number of delayed deliveries. If applied generally to a carrier's contracts, a remedy sought by on the house, which is an automatic refund, would radically alter the economics of the industry by I think there's a little difference here. I mean, your client sent out this press release that we've been talking about that says, in effect, don't even bother asking us for a refund, you're not going to get one. I mean, that's the effect of the press release. We're not going to honor them. Why doesn't that trigger the futility defense? Because this is not a defense that goes to the question of whether the plaintiffs are required to exhaust some administrative process. I mean, their own brief quotes the fact that you're not required to do a vain and useless act. Providing FedEx with notice within 30 days, as the case is established, is absolutely essential. They say we're not going to give you a refund. We're suspending our refund policy. A claimant should, nevertheless, call up and say, well. Absolutely. In any way. Absolutely, Justice, because what happens is nearly two years later, FedEx is told that 400,000 people or suit is now being brought in the names of 400,000 people, and they had no notice this is required. That's what a tie show in this circuit in 1985 is all about, how critical it is for the shipper to do it. I'm helpfully noted that under federal shipping law, there are only two exceptions to the notice of claims requirement. And that's where the shipper could not assess the loss despite reasonable diligence, or the carrier misled the shipper into believing it could recover without filing the claim. There's none of that here. The claims requirement was essential. With respect to their, I want to briefly mention their argument that there is some other claim here for excess billing. I think the federal common law precludes that. We're not arguing that the money back guarantee was the exclusive remedy. There is a remedy for actual damages actually caused by unreasonable delays. The problem with their lawsuit on this score is that there is no allegation of actual damages. All we know is that there were 60 seconds or more late. And here, I think the excess charge or overcharge claim runs about the fact that we have a time limit that requires requests for an overcharge to be filed within one year. And if this is not an overcharge, it falls within all other claims that must be brought within 90 days. And there was never any suggestion that those were in any way rescinded. Are you claiming that the late deliveries are overcharges? No. That is their. So the first one, you really aren't paying, you're not relying on that. Judge Fletcher, since there is no such claim either under the contract or at common law, it's not for us to say what it is that they're relying on. They actually cite the overcharge provision in their briefs as being the contractual basis for their suit. And as we noted, that is clearly barred. And there was no notice to anybody that that had been undone. So I think that that simply eliminates it. Plus the fact that we know that 90 percent of the priority shipments actually arrived on time. There's not a word in the record to indicate, not a word, or even an allegation in the complaint, that people who chose and paid for priority levels got anything less than expedited, go-to-the-head-of-the-line, special priority treatment. Their package arrived 61 seconds or more late. The time is running and I apologize for interrupting you. I go to the question I asked the other side, and that is assume for the moment that prior to August 8, the money back guarantee has in fact not been suspended. And assuming that we can get past the failure to object either by futility outright or by futility. And I can show that I would have complained. So anyway, we're actually looking at the money back guarantee. Could you address the solely caused by negligence exception to the money back guarantee provision, how it might operate here? I think it operates, Judge Fletcher, to completely preclude their claims. The service guide says on the liability to not assume that we will not be liable for any loss, damage, or delay, except as may result from our sole negligence. And I don't know of any plausible argument that our sole negligence was not responsible when we have both the check affidavit at ER 956 and the testimony of Mr. Glenn on the way in which this overwhelmed the system to establish that. Let me make the following. It's not an argument so much as an inquiry. I want to start out by the brief tells me and what I've been able to read in the fairly lengthy record that prior to the UPS strike, you had on-time delivery in about 98 percent of the cases. In the 2 percent where there was not on-time delivery, do we know how much of that 2 percent was due to sole negligence of FedEx? No, we do not. We know that claims were made within that 2 percent by about one out of four shippers chose to. And that is sort of consistent throughout the industry. And do we know as to those claims, how many of those resulted in getting money back guarantees? Those are successful claims. So one out of four successful claims. I don't know about the percentage of unsuccessful claims, but we think it's actually a fairly high percentage of of claims are probably paid because you've got a notice that the package is, you know, when the package is due and you and it says that it arrived at 827 and it's an 8 a.m. Well, what we know then is there's some real number of claims when you're in the non-crisis situation where you have honored the money back guarantee, having established to your own satisfaction that the delay was due solely to your negligence. Now, here we are in the crisis situation. And apparently, with the exception of very specific things like wrong address, your notation says due to strike, not our sole negligence. Does that mean that all of a sudden an operation that was from time to time solely negligence has become never negligent, never solely negligent? No. One could bring a claim during the strike period where an individual could show that the delay in their case was not related to or in any way caused by the strike. If you have a package there, the FedEx driver is intoxicated and runs into a tree. The packages have actually arrived in the delivery city and in plenty of time and your package doesn't get there. There's no argument of the following argument. And the district judge didn't explore them. I'm just trying to figure out what the possible complexities might be here if we're looking seriously at this sole negligence provision. I understand from a causation standpoint, irrespective of legal labels for the moment, the strike clearly was a major contributor to the delay. I mean, you're overloaded, you're taking all these packages, you're doing your best, and you have a successful delivery rate of 90%, which strikes me as pretty good. So in that sense, clearly the strike is a contributing cause. On the other hand, you get the strike and you make the decision to accept a lot of additional packages. That may be, I'm not quite sure how to characterize that, a supervening cause. That is to say, you didn't have to take all those packages. Having decided to take all those packages, now you've got delays and maybe it's your problem that having decided to take too many, you can't do it. Let me address that, Judge Fletcher. Cases like the coal cargo case from 1924 on, where you have the initial causation, we are allowed to operate in a reasonable, businesslike, diligent manner. There are 34,000 drop boxes and unmanned sites. And you have a system where the carriers are operating at virtually full capacity before the strike and the amount is doubled. And here's what, if you just look at the excerpts of record at about 1083 to 1084, Mr. They did what they could. They cut back for two hours. Most importantly, they said in the July 31st press release, we will not open any new accounts during the period of the strike. We will not schedule any new deliveries. We cut back two hours. They eliminated some Internet sites. They could not segregate out their existing customers. And this is critical. They had to service their traditional customer base. And it's not easy to single out who those are when many of them use the drop boxes. So there was a necessity also to keep the public billions of pounds moving through the system. But they took steps at every step of the way to mitigate this. And the burden actually under cases like cold cargo is on the plaintiffs to show where you have this initial causation, that there is some unreasonable response. This harm. Mr. Zlotnick, five minutes. I'd like to follow up points that Your Honor just made. The deliveries here were caused indirectly perhaps by the UPS strike, but directly by the fact that FedEx chose to accept many more packages than its system could handle. Mr. Dellinger points out that they cut back two hours. Well, if they wanted to, they could have cut back four hours or six hours, or they could have closed their drop boxes. They made a conscious decision to take advantage of the UPS strike, a decision that we don't fault them for at all. And they made $150 million in excess revenues during this roughly three-week window, which, again, we don't fault them for at all. That number's a pretty casual number. You say excess revenues. They say, well, wait a minute. How about our costs? Well, revenues. I'm passing that. I want to pay attention. But I think the record does make clear that $50 million in profits resulted from that $150 million after their various costs. FedEx's own affidavits were going by there. But my point is simply that they elected, they normally handle 2.5 million packages a day, roughly. During the UPS strike period, they took on an extra million packages a day, roughly speaking. That was their decision. They could have done things to control that. We think they made a good decision, personally, to take on this extra work. We don't fault that decision. But that's what caused the delays here. There's been no evidence and no contention that anything other than them taking on this additional million packages a day contributed to these delays. All of these delays were entered systematically on their system on what they called a VEX-84 code, which is a routine code that was not entered by the field personnel who record some reason for a delay, like bad weather or traffic or whatever. This was entered system-wide on every late package during this period. They just routinely attributed them all to the effects of the UPS strike. And that's why the futility doctrine is particularly appropriate here, because of the systematic treatment of the late delays. As this court held, and the systematic refusal to accept claims under the money-back guarantee or otherwise, as this court held recently in the Kildare case, when the agency applies a system-wide policy, nothing is gained from permitting the compilation of a detailed factual record, a factual record that couldn't have been compiled here because of FedEx's own behavior. They system-wide, they VEX-code 84 these late shipments. There was nothing to investigate. They couldn't, even if they wanted to, because there was no record at the field level of what caused any of these late delays. Your Honor, as to the excess charges claim, I want to stress the fact that this is not a damages claim. We're not seeking damages for perishables that were injured in a delay. We're simply seeking to enforce the express contractual provision, the rate provisions that take up 20 or 30 pages at the beginning of this contract. Neither the press release nor the August 8th amendment purported to suspend or change those rate provisions. FedEx could have done that. It could have taken a variety of steps, but nothing that they did. In fact, the amendment says that except as expressly amended, the service guide remains in effect. FedEx, when it charged someone for priority service but had provided a lesser level of service, breached those express rate provisions, which are perhaps the most material provision of the contract. Getting back to the futility issue, Mr. Dellinger stated, I believe, and I think it's a quote, everybody understood that we weren't offering the money back guarantee. FedEx broadly announced this. It doesn't matter whether the 1.9 million callers to the 800 number were calling to place an order for a pickup or to make a claim. It doesn't matter. They were all told by this recording, we're not honoring this money back guarantee during this period. So to impose a kind of reliance requirement in this setting where it would be really impossible for the plaintiffs to show because FedEx's actions are what negated their actions. FedEx negated. This is what I can't get my mind around. You acknowledge that everybody, apparently your shippers, knew that there would be no guarantee and shipped anyway. They had no choice, Your Honor. I mean, as a practical matter. They could call Airborne. They could use, God forbid, the Postal Service. But FedEx is correct in saying that at this time, you know, our customers, our clients were used to dealing with FedEx. And they relied on them. But everyone was, to some extent, overwhelmed, all of the shippers, because UPS is the largest delivery service. FedEx is the largest express delivery service, but UPS delivers a lot of packages. All of the competitors were facing similar constraints. Our clients and FedEx has many devoted customers who rely on it because of its guarantees and who expect the service that it has led them to believe they can expect from it. And FedEx was the one that decided to take on the additional business, even though they knew that it was going to compromise their ability to provide that service. Why is it unreasonable to ask an individual claiming under the money-back guarantee during this pre-August 8th period to say, whether to prove or not I leave off to one side for the moment, to say, I would have sought the money-back guarantee? Your Honor. As a condition even to getting into the futility question, I would have sought. Your Honor, we believe that it's just the futility issue focuses on the defendant's actions. And to try to hypothetically reconstruct, that's why what would have occurred. But if we don't have as a precondition to recovery someone saying, I would have sought, we are there to that degree rewarding people who, in the best of all possible worlds, would never have sought it and would never have gotten it. Well, Your Honor, I think that's why the district court required a proof of claim here, to try to account for the fact. Are you conceding proof of claim? Your Honor, we recognize why the district court ordered that. But I actually have a different question. And that is, why, as part of proof of claim, should there not be a requirement that the person say, at least I would have sought a refund and maybe actually even have a little proof, like in the past I've sought refunds or, you know, something more than just a bare statement? One could have that in a proof of claim. And obviously proofs of claim are filed under penalties of perjury. And, you know, that could be an element. And obviously because of the state of the record, the content of the proof of claim has not been determined yet. So that could be in it, certainly. I see I've passed my time, unless the Court has any further questions. Thank you. Thank you for the argument and also for the excellent briefing. In this case, we'll stand and recess.
judges: Silverman, W Fletcher, Rawlinson